ELISEBETH ELDERKIN, appellee, v. C. W. MONN and FOOTE & JENKS, INC., a Michigan corporation, appellees; CEDAR RAPIDS BOTTLING WORKS, intervenor-appellant.

No. 49089.

(Reported in 80 N.W.2d 331)

January 15, 1957.

Rehearing Denied March 8, 1957.

W. J. Barngrover, of Cedar Rapids, for intervenor-appellant.

D. M. Elderkin and J. J. Locher, Jr., both of Cedar Rapids, for plaintiff-appellee.

C. W. Monn, pro se.

V. C. Shuttleworth, of Cedar Rapids, for Foote & Jenks, Inc., appellee.

Smith, J.—Plaintiff brought this suit originally for an accounting with defendants, and an adjudication of their respective rights, in the "Sour Schnapps" trade-mark "and the profits and royalties therefrom", of which she claims to be a one-half owner as sole beneficiary under the will of her deceased husband, A. A. Elderkin.

He and defendant C. W. Monn had been partners for many years in a bottling business known as the "Cedar Rapids Bottling Works", engaged in the manufacture and sale of soft drinks. Sometime during this association they developed a flavor extract they called "Sour Schnapps" which trade name later was reg-

istered as a trade-mark (number 401954) in the name of defendant Foote & Jenks, Inc.

The chronology of events is important in an appraisal of the situation. We are aided by correspondence between the Cedar Rapids partnership and the Michigan corporation and other documentary evidence. Mr. Elderkin seems to have written always for the Cedar Rapids concern. An assignment of "Sour Schnapps" to Foote & Jenks, dated March 13, 1943, refers to the name "as applied to a nonalcoholic carbonated beverage, *which trade-mark has been continuously used by said partnership since November 15, 1938.*" (Emphasis supplied.)

Undoubtedly the Cedar Rapids Bottling Works *partnership* at that time owned the rights that had already arisen out of said use; and it assigned to Foote & Jenks, Inc., not merely the naked trade name, but also "the good will of the business attached to said mark."

The correspondence between the parties at that period reveals Foote & Jenks, Inc., was to attend to the details of registration and to assign it back to the Cedar Rapids partnership (which it did *September 8, 1943*) but was to be then authorized, as licensee, to use it and pay royalties to the partnership therefor. On *October 9, 1945,* however, a second assignment was executed by Foote & Jenks to "C. W. Monn and A. A. Elderkin", without reference to any partnership relationship. But they still were sole partners. Plaintiff's son, a lawyer in the case, testifies the earlier assignment was canceled but the testimony was objected to and may be ignored here. That, however, is of course the most reasonable explanation of the second assignment.

On *April 26, 1946,* the partnership (Cedar Rapids Bottling Works) became a corporation under the same name and took over the partnership assets including the "Hur-mon" line (the name of another line they handled). But no mention was made of the "Sour Schnapps" trade-mark. The reason for its omission was revealed a few months later.

On *October 22, 1946,* the two men, Elderkin and defendant Monn, signed articles of another partnership under the name "Sour Schnapps Company" which stated the trade name "Sour Schnapps" was owned by and constituted an asset of said new partnership.

The record here recites that attached to Exhibit 14 (the Patent Office trade-mark certificate) is an "assignment" from Foote & Jenks to "Sour Schnapps Company" shown to have been recorded in the United States Patent Office April 9, 1947.

That explanation of the second assignment finds further confirmation in a letter (Exhibits O-32 and O-33) dated August 27, 1945, in which suggested changes in the September 8, 1943, assignment are made.

On April 30, 1947, this new partnership and defendant Foote & Jenks, Inc., executed a written licensing agreement (Exhibit 4) in which the former, as "Licensor" and as "sole owner of the trade-mark 'Sour Schnapps' as filed for registration in the United States Patent Office * * *" grants to the "Licensee the authority, right, privilege, and license, within the territorial limits of the United States, to use the said name, trade-mark, and label aforesaid in connection with the sale and disposal of extracts and flavors manufactured by said Licensee and all in accordance with the following terms, conditions, and covenants * * *."

The "terms and conditions" are prescribed at length, even to the extent of setting out the exact terms of a "Sour Schnapps. Bottling Franchise" which the licensee and "Bottler" were authorized to use in connection with the sale, disposal and distribution of bottled "nonalcoholic beverages" through others.

On May 2, 1951, Foote & Jenks signed a "bottling franchise" with the Cedar Rapids Bottling Works (intervenor here) authorizing the latter to sell under the "Sour Schnapps" trade-mark. Defendant Monn signed as president of the Cedar Rapids corporation.

A. A. Elderkin died in 1951. Plaintiff pleaded and contends he owned a one-half interest in the "Sour Schnapps" formula represented or covered by the trade-mark and in the royalties paid and to be paid under the licensing agreement between the Sour Schnapps Company as licensor and Foote & Jenks, Inc., as licensee; and that she is now the owner of his rights.

Defendant Monn answered, denying this contention and praying that plaintiff's petition be denied. Defendant Foote & Jenks, Inc., also answered disclaiming knowledge of many of

plaintiff's allegations as to the affairs of both partners, asking dismissal as to plaintiff's petition and a decree that it be held to have made a full accounting of royalties under the license agreement.

Cedar Rapids Bottling Works (the corporation) intervened asking to be adjudged "the sole and absolute owner and the party entitled to the exclusive right to and the exclusive use of the trade-mark" and asking that plaintiff and defendant Monn be required to account for "all moneys paid them or each of them since" Mr. Elderkin's death, and for a decree entitling it to receive all future "revenue, income and royalties" under the agreement with defendant Foote & Jenks.

Trial court found for plaintiff, holding that: "Prior to the incorporation on April 26, 1946, and as a means of reserving for themselves the Sour Schnapps business, Mr. Elderkin and Mr. Monn agreed they would form another partnership under the name of 'Sour Schnapps Company' and retain in its name the Sour Schnapps business."

The intervenor only has appealed.

I. Appellant's "propositions relied on" (ten in number) may be reduced to these three: 1. A trade-mark, standing alone "divorced from an existing business" does not constitute a valid property right; 2. The assignments shown in this record are of a naked trade-mark, unconnected with any going business and are consequently invalid; and 3. The "Sour Schnapps Company" never existed as a going business.

 Our own court, in an early decision, quite accurately characterized a trade-mark as "a name, sign, symbol, mark, brand, or device of any kind, used to designate the goods manufactured or sold, or the place of business of the manufacturer or dealer * * *. The exclusive right in a trade-mark is acquired by its use, which the law does not require shall be continued for any prescribed time." Shaver v. Shaver, 54 Iowa 208, 210, 6 N.W. 188, 189, 37 Am. Rep. 194.

██ As used in America the term may be used to include both the manufacturer's and the dealer's purposes. 87 C. J. S., Trade-Marks, etc., section 1, page 219, citing La Republique Francaise v. Schultz, C. C. N. Y., 57 F.37, 41. It is of common-law origin and is protected in the absence of statute. Idem.

We need not analyze and comment on the many cases cited by intervenor relating to the law of trade-marks, and the proposition that a mere trade-mark (standing alone) does not have property rights. Many cases so hold but we do not deem them in point here. We think the real controversy here grows out of appellant's *assumption* that plaintiff is claiming what intervenor repeatedly calls a "naked" trade-mark. Appellant's brief refers to a "naked assignment", a "naked license to use." It ignores that plaintiff originally prayed for an accounting of all moneys received by defendant Foote & Jenks, as licensee under a written licensing or royalty agreement; and the evidence that there have been royalties paid thereunder.

Plaintiff pleads the formation of a partnership to be called "Sour Schnapps Company", expressly formed for carrying on the business not only of manufacturing and distributing "Sour Schnapps" but also of *"franchising* others to compound, manufacture, and process and sell and distribute same and the ingredients thereof under the trade-mark name." That does not of necessity mean the owner must have itself engaged in the actual manufacture and sale of the product.

The pleadings and proof make it clear plaintiff was not talking about a "naked" trade-mark, but one which the partnership ("Sour Schnapps Company") had licensed Foote & Jenks to use and sublet and for which the licensee was to pay royalties to the licensor. There is abundant evidence the trade-mark was far from "naked." The whole proceeding was clearly to establish a right to, and to recover a portion of, the royalties from its use.

This is not the more common controversy over violation of trade-mark rights. There is no charge here of unlawful competition or of violation of trade-mark rights in which the existence of trade-mark protection is questioned. It is merely argued there was no trade-mark which constituted property. Yet intervenor claims to be its owner, "entitled to the exclusive use of the trade-mark, 'Sour Schnapps' as a mark", etc.

There is abundant authority that a mere trade-mark, independent of use and accumulated good will, does not have property right.

But that proposition must be qualified. "A trade-mark is

property, and its owner has a property right therein, or rather it is more accurate to say that it is property in a qualified sense. When considered in the abstract, as an extrinsic thing [it] is not in any sense property. * * * The property is the use; * * *. * * * If it is used for a sufficient length of time so that the public associates [it] with the article purchased from the user of it, such user has a valuable right therein." 87 C. J. S., Trade-Marks, etc., section 2, page 220 et seq.

■ II. The record here satisfactorily shows a property right in the trade-mark "Sour Schnapps" as the subject matter of the claim made by plaintiff against defendants, and of intervenor's claim against plaintiff and defendants.

It is to be remembered. intervenor here is not the original partnership, "Cedar Rapids Bottling Works", which developed the trade name and the product to which it was attached, and in 1943 (March 13) assigned it to Foote & Jenks, and to whom Foote & Jenks first assigned it back (to "C. W. Monn and A. A. Elderkin d/b/a Cedar Rapids Bottling Works") September 8, 1943. It is the corporation of the same name which took over much of that partnership's assets.

When those two partners merged that partnership into a corporation (April 26, 1946) they did not include "Sour Schnapps" among the properties conveyed. We are cited no authority denying their right to withhold it. That property was conveyed again (October 9, 1945) by Foote & Jenks to the two men, not "d/b/a" but as plain individuals. It did not then belong to their partnership nor pass to the corporation. Instead the two men formed (October 22, 1946) a new partnership, "Sour Schnapps Company", which became the owner of the trade-mark and its appurtenant good will, and which entered into the licensing agreement with Foote & Jenks. And incidentally, Foote & Jenks then, under that agreement, later (1951) sublet it to intervenor.

We must agree with the trial court the two men had a right as sole partners to do with the property right as they desired. They were sole owners of the assets of the original partnership which merged into the corporation and had a complete right to withhold such part as they chose, at least so long as no one was deceived. That they did elect to withhold the "Sour Schnapps" seems clear.

III. Intervenor argues the second partnership (Sour Schnapps Company) never existed as a "going business." We can only grant this proposition by limiting the term "going business" to the actual ownership and operation of a physical manufacturing plant and maintenance of a sales organization to sell the manufactured product. But it cannot be so limited.

The partnership was formed in October 1946, and the following April entered into the licensing agreement with Foote & Jenks, already described herein. Certainly at that point of time it was a "going" concern—not necessarily itself in actual operation—but through a licensed agent authorized not only to sell, under the trade name the product already being manufactured by it, but also to contract with subagents or sublicensees similarly to carry on the business.

We think that licensing agreement was valid and that the "licensor" thereby dealt with a property right as real as if itself (in person) was manufacturing and selling the "Sour Schnapps" product. It was a "going business."

What we have said practically disposes of the appeal. Further discussion would probably result in useless repetition and elaboration by way of dictum upon the interesting law of trademarks. The trial court decreed plaintiff and defendant C. W. Monn each to be owner of a one-half interest in the trade-mark and Sour Schnapps business and that Foote & Jenks, Inc., has accounted for moneys due from it to February 15, 1956. The decree also dismissed the petition of intervention.

We agree with the conclusion reached and the decree is affirmed.—Affirmed.

BLISS, C.J., and OLIVER, WENNERSTRUM, GARFIELD, HAYS, LARSON, and PETERSON, JJ., concur.

THOMPSON, J., takes no part.